UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| GLENN WHITING, | ) | |
| | ) | Case No. 3:23-cv-2 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| CITY OF ATHENS, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Before the Court are the following motions: (1) a motion for summary judgment filed by Defendants Brandon Ainsworth, Deb Cardin, the City of Athens, Tom Garland, Rod Walker, and Seth Walker (Doc. 161); (2) a motion for summary judgment filed by Defendant Jameson Sliger (Doc. 163); (3) a motion for summary judgment filed by Defendants Bo Perkinson and Seth Sumner (Doc. 167); and (4) Plaintiff Glenn Whiting's motion to reopen discovery (Doc. 196). For the reasons that follow, the Court will **GRANT** the summary judgment motions (Docs. 161, 163, 167) and **DENY** Whiting's motion to reopen discovery (Doc. 196).

I.  BACKGROUND

On July 4, 2022, the City of Athens ("City") hosted an employee picnic and fireworks display (the "Picnic"). (Doc. 160, at 28.) City employees and their guests attended, but the Picnic was not open to the public. (*Id.* at 27.) Plaintiff Glenn Whiting attended the Picnic as a guest and decided to record it to "show the fact that [the Picnic] is wrong" and should be open to the general public. (*Whiting's Picnic Recording*, at 26:22.) His claimed expressive purpose

centered on the exclusion of the general public; it had nothing to do with the attendance, identities, or activities of children. (*Id.*)

When Whiting arrived at the Picnic, he interacted with several individuals, some of whom were City employees. All resistance these individuals expressed toward Whiting focused solely on preventing him from videoing children; no one discouraged him from otherwise livestreaming the Picnic.

The first person Whiting encountered was Defendant Jamison Sliger, a State of Tennessee employee. (Doc. 160, at 32 (Sliger recalling that he stopped working for the City in December 2016).) Sliger told Whiting not to record kids in the park, but the conversation did not escalate.[1] (*Id.* at 7.) Whiting then engaged with Defendants Rodney Walker and his son, Seth Walker. (*Id.* at 8.) Whiting's video recording shows Rodney Walker warning Whiting not to "get your camera next to my kids." (*Whiting's Picnic Recording*, at 4:53.) After Whiting informed him that he was livestreaming the event, the elder Walker responded: "I don't care what you're livestreaming, not my kids." (*Id.* at 4:56.) Whiting then asked him not to touch his phone. (*Id.* at 5:00.) It is unclear from the recording whether Rodney Walker made any contact with Whiting's phone. (*See generally Whiting's Picnic Recording*.) But, assuming he did touch the phone, he altered the phone's field of view only slightly, and not forcefully or abruptly, for at most seven seconds.[2] (*Id.* at 4:59–5:06.) Whiting then advised Rodney Walker that "if he wants to have an officer come over that's on duty, we can talk about it." (*Id.* at 5:14.) Rodney Walker then left the conversation to call an officer. (Doc. 160, at 64.) The entire interaction lasted, at

---

[1] Whiting and Sliger's interaction was not recorded. (Doc. 160, at 8.)

[2] The video clearly contradicts Whiting's unsworn assertion that it shows "Rod Walker clearly grabs Whiting's phone, attempts to take it away from Whiting, and holds on to it." (Doc. 186, at 31.)

most, twenty-five seconds. (*Whiting's Picnic Recording*, at 4:50–5:15.) It was the first time Walker had spoken with a police officer about Whiting. (Doc. 160 at 65.) He had not heard of Whiting prior to the Picnic. (*Id.*)

Whiting then spoke with Seth Walker, who was a City employee and Captain of the City Fire Department at the time, although he was not on duty during the Picnic. (*Id.* at 69, 72.) This conversation lasted only seventeen seconds. (*Whiting's Picnic Recording*, at 5:17–5:34.) Gesturing to Whiting, Seth Walker told him "I don't want your camera on my kids." (*Id.* at 5:17.) He then asked, "do you have my permission?" (*Id.* at 5:22.) Whiting advised that he did not need permission "on public property" and had "every legal right" to record. (*Id.* at 5:30.) Seth Walker again asked Whiting not to record his children. (*Id.* at 5:32.) Whiting proceeded to walk past Seth Walker, ending the interaction. (*Id.*)

At some point thereafter, Seth Walker informed Officer Garland that someone was causing a disturbance in the park by recording children. (Doc. 160, at 45.) Seth Walker stated in his deposition that, prior to the Picnic, he had neither met Whiting nor had he heard anything negative about him. (*Id.* at 70–71.) He testified that he did not accuse Whiting of pedophilia or of recording children, generally; he only "told him not to videotape mine." (*Id.* at 76.)

As Whiting continued to walk through the park with his phone out recording attendees,[3] Officer Garland approached him and queried, "hey buddy, can you do me a favor? Make sure you don't film any kids." (*Whiting's Picnic Recording*, at 9:27.) After pushback from Whiting, Officer Garland more firmly stated that "[f]ilming juveniles is not legal" and advised: "Causing a disturbance by filming someone's children is illegal. It's called a disturbance, and I can ask

---

[3] In Whiting's recording of the Picnic, a number of other unnamed individuals ask Whiting to stop recording. Whiting stated in his deposition that he was unable to identify these individuals. (Doc. 160, at 10–11.)

you to leave if it continues." (*Id.* at 9:38, 12:25.) He then clarified that, while the act of recording is not illegal, "causing a disturbance is breaking the law." (*Id.* at 10:20, 12:20–12:28.) At no point did Officer Garland prevent Whiting from recording; when later recapping the interaction to his friend, Whiting recalled that Officer Garland "explained that everything we are doing is legal . . . and he said just please don't talk to anybody if they yell at you. Just don't talk to them. Just walk on by . . . . He was real polite." (*Id.* at 14:35–14:55.) Officer Garland testified that he "had never met Mr. Whiting prior to our engagement" at the park; he had only "heard the name" in passing. (Doc. 160, at 44.) He also denied that anyone assaulted Whiting, noting that he "would have dealt with that" if they had. (*Id.* at 50.) At no point in the interaction did Officer Garland prevent Whiting from recording. (*Id.* at 45–46, 50.)

Defendant Seth Sumner served as City Manager at all relevant times. (Doc. 31, at 1.) Defendant Bo Perkinson served as the City's mayor at all relevant times. (*Id.* at 2.) Defendant Brandon Ainsworth was, at the time of the Picnic, the Chief of the City of Athens Fire Department. (*Id.* at 3.) Because "several groups of City invitees independently and consistently all made the same [] accusation [that Whiting was filming kids]," Whiting insists these comments could only be the product of Sumner, Perkinson, and Ainsworth's "assertions [to City employees] that [Whiting] intended to video record children [at the Picnic] for prurient purposes" and their instructions that Picnic attendees "harass, intimidate, threaten, and assault [ ] Whiting when he showed up." (*Id.* at 5.)

On January 3, 2023, Whiting initiated the instant suit against thirty-three Defendants. (Doc. 1.) On March 29, 2023, Whiting filed a first amended complaint, bringing claims against an assortment of Defendants for First Amendment retaliation and prior restraint, defamation, assault, battery, and intentional infliction of emotional distress ("IIED"). (Doc. 31, at 11-19.)

After Whiting filed his first amended complaint, Bo Perkinson and Seth Sumner jointly filed a motion for judgment on the pleadings. (Doc. 40.) On June 2, 2023, Brandon Ainsworth moved to dismiss Whiting's complaint against him. (Doc. 58.) Whiting sought to again amend his complaint (Doc. 44), but on June 16, 2023, United States Magistrate Judge Poplin denied his motion (Doc. 63). Whiting filed an objection to Judge Poplin's order (Doc. 69), which the Court overruled (Doc. 81). The Court also denied Whiting's subsequent motion to amend his complaint and granted former Defendant Ty Gables's motion to dismiss due to insufficient service of process. (Docs. 90, 107–08.) On September 18, 2023, the Court granted in part and denied in part the motion to dismiss and motion for judgment on the pleadings (Doc. 113). On March 25, 2024, Defendants all filed for summary judgment as to the claims remaining against them: First Amendment retaliation, state-law defamation, assault, battery, and IIED (Docs. 161, 163, 167). The motions (*id.*) are ripe for review.

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of

support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

### III. FIRST AMENDMENT RETALIATION

Whiting's First Amendment retaliation claim is brought pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

To succeed on a claim under § 1983, a plaintiff must show: (1) "that he or she was deprived of a right secured by the Constitution or laws of the United States" and (2) "that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted). Even assuming Defendants were acting under color of law, the undisputed facts do not support Whiting's First Amendment retaliation claim.

"[R]etaliation for the exercise of constitutional rights is itself a violation of the Constitution." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (quoting *Allen v.*

6

*Wright*, 468 U.S. 737, 751 (1984)); *see also Hines v. Gomez,* 108 F.3d 265, 269 (9th Cir. 1997) ("[T]he injury asserted is the retaliatory accusation's chilling effect on [Plaintiff's] First Amendment rights . . . We hold that [his] failure to demonstrate a more substantial injury does not nullify his retaliation claim."), *cert. denied,* 524 U.S. 936 (1998). To prevail on a retaliation claim, a plaintiff must establish that: (1) he was engaged in constitutionally protected conduct; (2) the defendant's adverse action caused him to suffer "an injury that would likely chill a person of ordinary firmness from continuing to engage in that conduct"; and (3) that the adverse action "was motivated at least in part as a response to the exercise of [the plaintiff's] constitutional rights." *Lucas v. Monroe Cnty.*, 203 F.3d 964, 973 (6th Cir. 2000). Whiting fails to point to any evidence to satisfy the second or third elements of his claim.

In its analysis of Whiting's First Amendment retaliation claim, the Court will first discuss the lack of evidence that Defendants took an adverse action against Whiting. Nothing in the record suggests Perkinson or Sumner instructed Picnic attendees to harass Whiting at the event. Rodney Walker, Seth Walker, Officer Garland, and Sliger interacted with Whiting at the Picnic by advising him not to record children, but such interactions were *de minimis* for First Amendment retaliation purposes. Then, the Court will discuss the lack of evidence suggesting that Defendants' actions were motivated by his expressive conduct—livestreaming the Picnic—rather than a desire to protect the children in attendance. Finding that Whiting has failed to support the adverse-action or motivating-factor elements of a First Amendment retaliation claim, the Court will grant summary judgment as to this claim.

### A. The Undisputed Evidence Demonstrates Defendants Took No Adverse Action Against Whiting.

Whiting provides evidence of only inconsequential actions by Defendants. These actions are not sufficiently adverse to support a First Amendment retaliation claim. The satisfaction of some elements of a First Amendment retaliation claim, such as whether an action is sufficiently adverse, is context-dependent and requires consideration of the encounter's unique setting. *Thaddeus-X*, at 388–89 ("Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting—whether the activity is 'protected' or an action is 'adverse' will depend on the context."). In that vein, "[w]hether an alleged adverse action is sufficient to deter a person of ordinary firmness is generally a question of fact." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583–84 (6th Cir. 2012) (citing *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). But if a "plaintiff's alleged adverse action is 'inconsequential,' resulting in nothing more than a '*de minimis* injury,' the claim is properly dismissed as a matter of law." *Id.* at 584 (citing *Bell*, 308 F.3d at 603, 606). After all, "[t]here is, of course, a *de minimus* level of imposition with which the Constitution is not concerned," and courts must take care "to ensure that real injury is involved" so as to not "trivialize the First Amendment by sanctioning a retaliation claim even if it is unlikely that the exercise of . . . rights was actually deterred." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977); *see also Thaddeus-X*, 175 F.3d at 396 ("It is not necessarily true . . . that every action, no matter how small, is constitutionally cognizable."); *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005) (quoting *Thaddeus-X*, 175 F.3d at 397).

Whiting alleges two possible categories of adverse actions taken by Defendants: (1) statements made by City officials prior to the Picnic directing attendees to "harass, threaten, and assault [] Whiting when he showed up at [the Picnic]"; and (2) actions taken by Picnic attendees

at the event itself. (Doc. 31, at 5; *see also* Doc. 186, at 3 ("City employees physically assault Whiting, verbally abuse Whiting, attempt to stop Whiting from video-taping, and most disturbingly accuse Whiting of video-taping children from prurient purposes, all in an attempt to prevent Whiting from filming").)

Nothing in the record supports the first allegation.[4] Whiting stated as much in his deposition:

> Q: Okay. So as of right now, you don't have any direct evidence that either Bo Perkinson or Seth Sumner said anything to anyone about you going to the July 4, 2022 event, correct?
>
> ***
>
> A: We don't have any evidence to show anyone personally did. We have circumstantial evidence that shows it's impossible for it to have happened without somebody telling them what to do, and when the people at the top cover it up, you have to assume they are covering up for what they are worried will expose them.
>
> Q: Now, have you heard any evidence of a meeting or something that took place prior to July 4, 2022 where this could have happened?
>
> A: Obviously, there's nobody in the City that would ever talk to me. So obviously everything I used to hear, the phone calls I would get from people leaking the information, that's all totally stopped. So to answer your question direct[ly], no, sir.

---

[4] Statements by City officials that were made prior to the Picnic also cannot have been issued in retaliation for conduct that had not yet occurred—Whiting's actions at the Picnic. The statements could, however, serve as a prior restraint on Whiting's protected conduct. *See Novak v. City of Parma, Ohio*, 33 F.4th 296, 307 (6th Cir. 2022), cert. denied, 143 S. Ct. 773, 215 L. Ed. 2d 45 (2023) ("A prior restraint is an administrative or judicial order that forbids certain speech ahead of when that speech is planned to take place.") (citation omitted)). But the total lack of evidence that the statements were ever made dooms either a First Amendment retaliation or prior-restraint claim. (*See* Doc. 166, at 21–23 (Whiting testifying he had not heard any evidence of a meeting occurring prior to the Picnic); *see also id.* at 24 (Perkinson stating in a sworn affidavit that he "[a]t no time leading up to July 4, 2022, [] discuss[ed] Glenn Whiting's potential attendance at Athens Regional Park on July 4, 2022 with any employee of the City"), 26 (Sumner stating in a sworn affidavit that he "d[id] not recall if I was aware that Glenn Whiting might attend the [Picnic]," and that he "did not . . . advise[] anyone . . . to harass, intimidate, threaten or otherwise engage with Mr. Whiting in any fashion" ).)

\*\*\*

Q: But nobody has come to you similarly in this case to say, "[h]ey, I heard Seth Sumner say something."

A: Absolutely not.

Q: And nobody has come to you and said, "[h]ey, I heard Bo Perkinson say something."

A: Absolutely not.

(Doc. 166, at 21–23.) Whiting offers no such evidence regarding any other City official or employee.

As the Court noted in its order ruling on Defendants' various motions to dismiss, Whiting and his former counsel's reliance on the legal doctrine of *res ipsa loquitur* is inapplicable in this context and cannot shoulder a First Amendment retaliation claim. (*See* Doc. 113, at 14 n.7.) Though the Court did not dismiss Whiting's claim under Rule 12, it expressed skepticism that there was any "known evidentiary support for the allegation that Picnic attendees' behavior toward Whiting was directed by Defendants" and reminded Whiting of his "burden to gather and produce evidence to support these factual allegations." (*Id.*) Now that discovery has closed and Whiting has had the opportunity to present evidence to support his allegations, it is clear the Court's concern was well founded. The mere fact that a few people objected to Whiting's recording of children at the Picnic is not proof of a pre-existing conspiracy to retaliate against his exercise of speech; it suggests nothing more than that the people did not want their children recorded. Because the record is bereft of any support that Defendants instructed Picnic attendees to harass Whiting at the event, he cannot succeed on a First Amendment retaliation claim against them based on those alleged actions.

Likewise, the second category of allegedly adverse actions also lacks support in the record, as was again confirmed by Whiting's own testimony in his deposition. Actions taken by

Defendants present at the Picnic[5] are, for the most part, captured on video and do not portray the harassing or assaultive behavior Whiting alleged. And Whiting does not support unrecorded alleged actions with evidence.[6]

Defendant Sliger, the first person Whiting ran into at the event, merely told Whiting not to record kids in the park.[7] (Doc. 160, at 7.) He did not even discourage Whiting from livestreaming the Picnic in general. Others shared a similar sentiment as Whiting made his way through the Picnic.

Defendants Rodney and Seth Walker each asked him not to record their kids and sought out an officer to intervene in the spat. (*Whiting's Picnic Recording*, at 4:53; Doc. 160, at 45, 64.) Though Whiting claims that "Rod Walker clearly grabs Whiting's phone, attempts to take it away from Whiting, and holds on to it," the video shows no such action. (Doc. 186, at 31.) Any contact was minor, objectively unthreatening, and lasted only a few seconds. (*See generally Whiting's Picnic Recording*.) Whiting offers no evidence that Rodney Walker made or

---

[5] Some Defendants, including Cardin, Perkinson, and Sumner, were not present at the Picnic.

[6] Whiting testified that his allegations against Deb Cardin—that she yelled during the Picnic "don't fucking video tape kids in the goddamned park. Don't let me catch you doing it again . . . . Get the fuck out of here!"—were based on a misidentification and that there is no basis for a claim against her. (Doc. 31, at 9; Doc. 120, at 5–8.)

[7] Whiting's interaction with Sliger was not recorded, but the content and nature of the exchange are not disputed.

11
Case 3:23-cv-00002-TRM-DCP Document 211 Filed 06/14/24 Page 11 of 19 PageID #: 2245

threatened to make any harmful contact with him and even states as much in his deposition.[8] [9]

---

[8] Whiting cites a number of documents in his response, the vast majority of which are not actually attached to the response. Even if the documents were attached, most of the references themselves, which can hardly be called "citations," do not provide enough information to lead a reader to the relied-upon evidence. For instance, Whiting repeatedly mentions an order from "an unbiased Court" that "factually found that Sumner created City policy for application against Whiting alone." (Doc. 186, at 26.) But whenever Whiting references the contents of the order, he simply writes "(Order)" at the end of the sentence. (*Id.*) The supposed order is nowhere to be found in the record.

Despite this disarray, for which the Court is not obligated to compensate, it nonetheless waded through all materials provided by Whiting to ascertain whether there existed any evidence to support his claim. *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("[J]udges are not like pigs, hunting for truffles" that might be buried in the record."). The Court embarked on this truffle-hunting endeavor on account of Whiting's *pro se* status. (*But see* Doc. 192, at 1–2 (the Court noting that "Plaintiff's response's apparent inconsistency with his previous *pro se* filings," alongside other factors, "raise a question as to whether inappropriate actions have taken place").) But rather than focus on issues relevant to the legal issues of this case, the filings discuss topics as divergent as "charges against [City councilman] Dick Pelley for abandoning [a] woman at [a] hotel," (Doc. 188, at 43), an HR investigation of male anatomy on a lunchbox, (*id.* at 52), and the City's management of a baseball team, (*id.* at 188–89).

[9] One of the documents Whiting alludes to in his response is an unauthenticated deposition transcript from Athens Police Chief Fred Schultz, who supposedly "testified that it was clear from the video that Rod Walker grabbed [W]hiting's phone." (Doc. 186, at 31.) Whiting does not cite to the document in his response, and there is no such deposition transcript filed alongside his response. After some digging, however, the Court located the relevant quote within a 114-page "declaration" filed long after Whiting's summary judgment response deadline. (Doc. 188, at 25 ("Q: Okay. And would you agree that it's more or less likely that Rod Walker grabbed Mr. Whiting's phone . . . based on the video alone? A: Yes").) The document is not signed, sworn by the deponent, or certified by a court reporter. *See* Fed. R. Civ. P. 30(f) (requiring that depositions are signed, sworn by the deponent, and certified by a court reporter); *see also Orr v. Bank of Am.,* 285 F.3d 764, 774 (9th Cir. 2002) (holding that excerpts of deposition transcripts submitted without the names of the deponent and the action and without the reporter's certification are not authenticated and, therefore, are inadmissible and must be excluded from consideration on summary judgment).

Setting aside the document's admissibility issues, Schultz's interpretation is blatantly contradicted by the video. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). After Rodney Walker requested that Whiting stop recording his kids, there is a seven-second interval during which he arguably appeared to slightly alter the phone's field of view. (*Whiting's Picnic Recording*, at 4:59–5:06.) He does not "grab," "attempt[] to take," or "hold on to" Whiting's phone at any point. (*Id.*)

(Doc. 186, at 31.)

In fact, Whiting specifically testified that he was not concerned that Rodney Walker was "going to strike you or hurt" him. (*See* Doc. 160, at 22 ("Q: During your interaction with Rod and Seth Walker, were you concerned that they were going to strike you or hurt you? A: I can't say that was a concern.").)

Any contact Rodney Walker made with Whiting's phone was not sufficiently adverse to support a claim. An action is sufficiently adverse when it causes a plaintiff to "suffer a threat to his economic livelihood," subjects him to defamation, requires him to "endure a search or seizure of property," or forces him to "experience the public disclosure of intimate or embarrassing information." *Wurzelbacher*, 675 F.3d at 585 (collecting cases). Touching Whiting's phone is best categorized as a "search or seizure," but it is easily contrasted with cases in which the Sixth Circuit held that a seizure was sufficiently adverse in the First Amendment retaliation context. In *Bell v. Johnson*, for instance, the Sixth Circuit held that Bell presented sufficient evidence he suffered an adverse action when "defendants twice left the plaintiff's cell in disarray, confiscated his legal papers without returning them, and stole the medical diet snacks that had been provided to him to alleviate his weight loss from AIDS." 308 F.3d at 605. The *Bell* court reasoned that "this evidence tend[ed] to show that the defendants' actions had an intimidating effect on the plaintiff, and therefore could have deterred others" from exercising their protected right as well. *Id.* In contrast to *Bell*, Rodney Walker did not confiscate or damage Whiting's phone, and there is no evidence to suggest that his actions led Whiting to experience harm or apprehension of harm.

Defendant Officer Garland's interactions with Whiting were similarly uneventful. Garland politely asked Whiting not to record children in the park, and the two engaged in a civil

discussion about how Whiting can still record without "causing a disturbance." (*Whiting's Picnic Recording*, at 9:27–12:28.) Nothing in the record suggests Garland stopped Whiting from recording or took any other negative action towards him.[10] Because Whiting has not proffered evidence that any Defendant took an adverse action against him, he cannot succeed on a First Amendment retaliation claim.

> **B. The Undisputed Evidence Establishes that Defendants' Actions Were Motivated by Concern over Their Children, Not over Whiting's Livestreaming of the Picnic.**

There is also no evidence in support of the third element of Whiting's First Amendment retaliation claim: that Defendants' allegedly adverse actions were in some way motivated by his livestreaming. Even construing all facts in a light most favorable to Whiting, there is nothing to suggest that Whiting's inclusion of children in the livestream was anything more than incidental; the children's presence was not a focus of his alleged expressive conduct. Whiting wanted to livestream the Picnic to "show the fact that [the Picnic] is wrong" and should be open to the general public. (*Whiting's Picnic Recording*, at 26:22.) Nothing in the record suggests Defendants intended to prevent Whiting from livestreaming the event for this purpose; rather,

---

[10] Whiting suggests, for the first time, in his summary judgment response that Officer Garland illegally detained him at the Picnic during this interaction. (Doc. 186, at 23–24.) To the extent Garland seized Whiting by interacting with him for a few minutes during the Picnic, the seizure was lawful. Garland was responding to reports of a disturbance and asked Whiting questions related to that report. *See United States v. Gross*, 550 F.3d 578, 582–83 (6th Cir. 2008) ("Whether the seizure is reasonable is determined by considering first whether the officer's action was justified at its inception, and second whether it was reasonably related in scope to the circumstances which justified the interference in the first place.") All the while, Garland allowed Whiting to continue to record the event and even provided him with advice on how to do so without disturbing others. (*See Whiting's Picnic Recording*, at 14:35–14:55 (Whiting recalled that Officer Garland "explained that everything we are doing is legal . . . and he said just please don't talk to anybody if they yell at you. Just don't talk to them. Just walk on by . . . . He was real polite.").) Because the undisputed facts demonstrate that Garland had reason to initiate a conversation with Whiting about his recording and that the conversation was related to that action, no reasonable juror could find that Garland "illegally detained" Whiting at the Picnic.

Sliger, Rodney Walker, Seth Walker, and Officer Garland merely asked him not to record children in attendance. No one asked Whiting to stop livestreaming at any point during the Picnic. In fact, Officer Garland advised Whiting on how to continue livestreaming without "creating a disturbance." (*Whiting's Picnic Recording*, at 9:27–12:28.) The undisputed evidence demonstrates that Defendants were not motivated by Whiting's livestreaming of the event in general, but by his inclusion of children in that effort. No evidence even hints that anyone was motivated to stop Whiting's effort to "show the fact that [the Picnic] is wrong." (*Id.*) Because Whiting has not pointed to evidence suggesting any Defendant's allegedly adverse action was motivated by his expressive conduct, his First Amendment retaliation claim fails.[11]

## IV. State-Law Claims

Whiting also brings a variety of state-law claims against various Defendants, including claims for defamation, IIED, assault, and battery. (*See* Doc. 31.) Because the Court will grant summary judgment as to the only federal claim in this action, it will decline to exercise supplemental jurisdiction over the remaining state-law claims. *See, e.g.*, *Gardner v. TBO Capital LLC*, 986 F. Supp. 2d 1324, 1336 (N.D. Ga. 2013) (citations and internal marks omitted) (noting that "[t]he exercise of supplemental jurisdiction is discretionary," and that a district court

---

[11] The City of Athens is also a defendant in this case. The Supreme Court has held that municipalities and other local governments "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). To succeed on a *Monell* claim, a plaintiff "must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas,* 398 F.3d at 429 (citing *Monell,* 436 U.S. at 694). For this reason, a *Monell* claim may only succeed when a reasonable jury could find the underlying alleged constitutional violation occurred. Because the Court will grant Defendants' summary judgment motion as to the only constitutional claim in this case, Whiting cannot succeed on a *Monell* claim against the City. Therefore, the Court will also grant summary judgment as to that claim.

therefore "has discretion to decline to exercise jurisdiction" over a plaintiff's remaining state law claims once the federal claims that provide the basis for original jurisdiction have been dismissed); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (noting that when "all federal law claims are eliminated before trial, the balance of factors to be considered under pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state law claims"); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). Therefore, the Court will dismiss all state-law claims.

## V. Motion to Reopen Discovery (Doc. 196)

On May 20, 2024, over three months after the close of discovery, Whiting moved to reopen discovery to take additional depositions. (Doc. 196.) According to Whiting, "there are still Defendants that due to the limit of depositions have not been deposed and many names learned from the depositions that Plaintiff believes would support claims that have been denied." (*Id.* at 2.) He posits that he "should be allowed to do follow up based on the answers he got from the depositions" and that he "will assume there will be a lot of supporting testimony helping the Plaintiff but without the depositions no one will know." (*Id.* at 3.) Before discovery ended on February 26, 2024, Whiting conducted fifteen depositions totaling nearly two thousand pages. (Doc. 197, at 2.)

This is the second motion to reopen discovery filed by Whiting. The first, filed on May 1, 2024, accuses Defendants of lying about potential witnesses' availability for deposition, which

he argues unjustly denied him of discovery "needed before trial." (Doc. 186, at 19.) Even though that request came over two months past the close of discovery, would delay trial, prejudice Defendants by requiring them to refile summary-judgment motions, and did not appear likely to assist with resolution of the case on its merits, the Court left the door open for Whiting to substantiate his request. (Doc. 193, at 2.) Specifically, the Court ordered Whiting to file a motion "explaining [] good cause and specifying what discovery he wishes to conduct, his basis for asserting that such discovery will impact this case, his explanation for why he did not secure the discovery before the discovery deadlines, and his reason for delaying his request for relief." (*Id.* at 2–3.) Whiting filed the present motion to reopen discovery in response. (Doc. 196.)

Whiting has not met his burden in demonstrating the need to reopen discovery.[12] In his motion, he insists on taking at least seven more depositions, including that of City Councilman Dick Pelley, Officer Parsons, Cliff Couch, Valerie White, Devin Hicks, "several of the firefighters' wives and mothers," "Nina Edgemon," and "the rest of the Defendants." (*Id.* at 2–4.) Whiting does not explain away his delay in seeking to depose these individuals, nor does he elaborate on why their testimony is necessary. By failing to do so, Whiting elided all instruction from the Court as to the minimum showing to re-open discovery, and therefore has not shown such an action is warranted. (Doc. 193, at 2–3.)

Further, Judge Poplin already denied a request from Whiting to take depositions in excess of the ten-deposition limit set forth by Federal Rule of Civil Procedure 30(a)(2)(A)(i). In doing

---

[12] Whiting's response is accompanied by two unsworn "declarations": one by Whiting himself and one by City Councilman Dick Pelley. (*See* Docs. 196-1, 196-2.) A declaration may be considered only if it is: "(1) in writing, (2) dated, and (3) verifies that its contents are 'true under penalty of perjury.'" *Reed v. Tennessee State Bancshares, Inc.*, No. 305-cv-498, 2007 WL 2317393, at *1 (E.D. Tenn. Aug. 9, 2007) (citing 28 U.S.C. § 1746). Because the filings have not been made under penalty of perjury, the Court will not consider them.

so, Judge Poplin noted that "[t]he mere fact that more than ten individuals may have discoverable information in a case does not mean that taking more than ten depositions makes sense." (Doc. 157, at 3 n.2 (quoting *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100, 2020 WL 1285359, at *8 (D. Kan. Mar. 18, 2020).) The same tenet applies to Whiting's present motion—he cannot embark on a boundless fishing expedition baited by the potential of "supporting testimony helping the Plaintiff."[13] [14] (Doc. 196, at 3.) Because Whiting has not provided good cause to support his request to re-open discovery at this late stage in litigation, the Court will **DENY** his request (Doc. 196).

## VI. CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendants' motions for summary judgment (Docs. 161, 163, 167) and **DENY** Whiting's motion to reopen discovery (Doc. 196). Accordingly, the Court will **DISMISS WITH PREJUDICE** Whiting's First Amendment retaliation claims and **DISMISS WITHOUT PREJUDICE** the state-law defamation, assault, battery, and IIED claims against all Defendants. Because no claims remain against any Defendant in this matter, the case will be **DISMISSED**. There are a number of outstanding

---

[13] The Court granted Whiting, then represented by counsel, a two-month extension to conduct discovery in light of counsel's medical issues. (Doc. 128.) After another request to extend discovery, the Court advised Whiting that it would "consider revising the discovery deadline if presented with a detailed deposition schedule that provides for the completion of discovery by the end of March." (Doc. 149.) Because Whiting took no action in response, the Court did not extend the discovery deadline.

[14] Whiting has also not carried his burden of demonstrating that additional depositions are now necessary. *See* Fed. R. Civ. P. 30(a)(2)(A)(i). The Court has provided him and, when he was represented, his counsel ample time to complete discovery; indeed, he and his counsel conducted fifteen depositions before the close of discovery. Whiting has not shown that additional discovery would be proportional to the needs of the case or that any benefit of conducting additional discovery outweighs the burden. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery into any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit.").

motions in this case (Docs. 118, 158, 173, 176, 183, 194–95, 204–06), which are mooted by the Court's grant of summary judgment as to all claims.  As such, the Court will **DENY AS MOOT** those motions (Docs. 118, 158, 173, 176, 183, 194–95, 204–06).

      **AN APPROPRIATE JUDGMENT WILL ENTER.**

                                            */s/ Travis R. McDonough*
                                              **TRAVIS R. MCDONOUGH**
                                              **UNITED STATES DISTRICT JUDGE**